# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 9, 2021        Decided August 26, 2022

No. 20-5126

NYC C.L.A.S.H., INC., ET AL.,
APPELLANTS

v.

MARCIA L. FUDGE, SECRETARY OF HOUSING AND URBAN
DEVELOPMENT, IN HER OFFICIAL CAPACITY AND UNITED
STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-01711)

———

*Lawrence J. Joseph* argued the cause and filed the briefs
for appellants.

*Lindsey Powell*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With her on the brief were
*Brian M. Boynton*, Acting Assistant Attorney General, and
*Mark B. Stern* and *Alisa B. Klein*, Attorneys.

Before: SRINIVASAN, *Chief Judge*, JACKSON\*, *Circuit Judge*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  In 2016, the Department of Housing and Urban Development promulgated a rule prohibiting the use of lit tobacco products in HUD-subsidized public housing units and their immediate surroundings.  The Smoke Free Rule is meant to improve air quality within public housing, protect residents from health risks associated with secondhand smoke, reduce the risk of fires, and decrease the cost of property maintenance.

Appellants here, led by New York City Citizens Lobbying Against Smoker Harassment (C.L.A.S.H.), brought an action raising a number of statutory and constitutional challenges to the Rule.  The district court rejected all of C.L.A.S.H.'s claims. We agree with the district court and thus affirm its grant of summary judgment to the Department.

## I.

### A.

The Housing Act of 1937 declares it to be "the policy of the United States" to "assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families."  42 U.S.C. § 1437(a)(1)(A).  The statute authorizes the Department of Housing and Urban Development to provide federal financial contributions to public housing agencies

---

\* Circuit Judge, now Justice, Jackson was a member of the panel at the time the case was argued but did not participate in this opinion.

(PHAs) to develop and maintain public housing. *Id.* § 1437c. PHAs are state and local entities "authorized to engage in or assist in the development or operation of public housing." *Id.* § 1437a(b)(6)(A).

Contribution contracts for PHAs "shall require that the agency maintain its public housing in a condition that complies with . . . housing quality standards" established by the Department. *Id.* § 1437d(f)(1). The Department's "housing quality standards" must "ensure that public housing dwelling units are safe and habitable." *Id.* § 1437d(f)(2). To that end, the standards "shall include requirements relating to habitability, including maintenance, health and sanitation factors," and "condition . . . of dwellings." *Id.*

B.

In November 2015, relying on its authority under § 1437d(f)(2) "to ensure that public housing dwelling units are safe and habitable," the Department proposed a rule requiring PHAs to implement a smoke-free policy in public housing units. Instituting Smoke-Free Public Housing, 80 Fed. Reg. 71,762 (proposed Nov. 17, 2015). In December 2016, after a period of notice and comment, the Department promulgated the final rule. Instituting Smoke-Free Public Housing, 81 Fed. Reg. 87,430 (Dec. 5, 2016).

The Rule instructs PHAs to prohibit lit tobacco products in all indoor areas of public housing, including but not limited to living units, indoor common areas, electrical closets, and administrative office buildings. *Id.* at 87,444; 24 C.F.R. § 965.653(a). The prohibition also extends to outdoor areas within twenty-five feet of public housing and administrative buildings. PHAs retain the discretion to establish designated

smoking areas outside the twenty-five-foot perimeter. 81 Fed. Reg. at 87,444; 24 C.F.R. § 965.653(b).

The Department explained that the Rule "is expected to improve indoor air quality in public housing; benefit the health of public housing residents, visitors, and PHA staff; reduce the risk of catastrophic fires; and lower overall maintenance costs." 81 Fed. Reg. at 87,431. The Department relied on scientific evidence documenting both the deleterious health effects of secondhand smoke and the migration of secondhand smoke along hallways and between apartments within multi-unit buildings. 80 Fed. Reg. at 71,763–64. The Department noted that "[t]he Surgeon General has concluded that there is no risk-free level of exposure to SHS [secondhand smoke]." *Id.* at 71,763. With regard to the link between smoking and the risk of fires, the Department cited studies documenting the connection and establishing that "[s]moking is the leading cause of fire deaths in multiunit properties." *Id.* at 71,764. "Smoking is also associated with higher maintenance costs for landlords," the Department explained, including "the need for additional cleaning, painting, and repair of damaged items at unit turnover compared to non-smoking units." *Id.* The Department reviewed various studies and surveys estimating those additional costs.

To implement the Rule, the Department amended the regulations governing PHA leases to include the requirement that tenants agree not to smoke in restricted areas. 24 C.F.R. § 966.4(f)(12)(i)(B), (ii)(B). The regulations also require PHAs to amend existing tenant leases and applicable PHA plans in accordance with the Rule. *Id.* § 965.655. A tenant's failure to fulfill household obligations can be grounds for termination or eviction, although the terms of the Rule leave enforcement to the discretion of each PHA. *Id.* § 966.4(*l*).

5

C.

In July 2018, C.L.A.S.H. and aligned parties filed an action against the Department, raising constitutional and statutory challenges to the Smoke Free Rule. C.L.A.S.H. argued that the Department lacked statutory authority to promulgate the Rule and that the Rule is arbitrary, capricious, and an abuse of discretion. C.L.A.S.H. further claimed that the Rule exceeds the Department's powers under the Spending and Commerce Clauses, and that it violates the Fourth, Fifth, and Tenth Amendments.

The district court granted summary judgment in favor of the Department, rejecting all of C.L.A.S.H.'s challenges in a thorough opinion. *NYC C.L.A.S.H., Inc. v. Carson*, 442 F. Supp. 3d 200, 223 (D.D.C. 2020). C.L.A.S.H. now appeals.

II.

C.L.A.S.H. renews the same statutory and constitutional claims it unsuccessfully advanced in the district court. We first address the statutory challenges and then turn to the constitutional ones. We, like the district court, conclude that all the challenges lack merit.

A.

In its statutory arguments, C.L.A.S.H. contends that the Smoke Free Rule exceeds the authority granted to the Department under the Housing Act, and that the Rule is arbitrary and capricious in contravention of the Administrative Procedure Act.

1.

We first consider—and reject—C.L.A.S.H.'s contention that the Department's grant of authority under the Housing Act does not encompass the Smoke Free Rule. The Act directs the Department to "establish housing quality standards . . . that ensure that public housing dwelling units are safe and habitable." 42 U.S.C. § 1437d(f)(2). And those housing quality standards must include "requirements relating to habitability, including maintenance, health and sanitation factors," and "condition . . . of dwellings." *Id.*

The ordinary meaning of terms such as "safe and habitable," "maintenance," "health and sanitation," and "condition of dwellings" embraces a rule prohibiting use of lit tobacco products in public housing units "to improve indoor air quality in public housing; benefit the health of public housing residents, visitors, and PHA staff; reduce the risk of catastrophic fires; and lower overall maintenance costs." 81 Fed. Reg. at 87,431. Those objects of the Rule directly relate to the "safety," "habitability," and "condition of dwellings" in public housing and to "maintenance, health and sanitation factors" associated with those dwellings. 42 U.S.C. § 1437d(f)(2). Below, we consider the extent to which the Department adequately substantiated the connection between the Rule and those objectives when we review C.L.A.S.H.'s arbitrary-and-capricious challenge. But on the question we consider here of whether the Rule lies within the statute's grant of authority to the Department, the plain language of the statute encompasses the Rule.

In resisting that straightforward understanding of the statutory terms, C.L.A.S.H. relies on a presumption against preemption in fields traditionally occupied by state and local governments. No degree of presumption, however, supports

the conclusion that a rule directly related to, and promulgated to ensure, the safety, health, habitability, and maintenance of dwelling units falls outside a statutory grant of authority to address those precise subjects by name.

C.L.A.S.H. emphasizes that states and localities "have a long history of regulating housing standards for the health and safety of the community." C.L.A.S.H. Br. 39. The Rule, though, operates only in the context of public housing subsidized by federal funding—a context in which the establishment and regulation of housing standards is entrusted by statute to a federal agency. And within that domain, the Department's regulations impose an array of obligations on tenants related to the health and safety of their housing—including requirements that tenants safely dispose of garbage and waste, refrain from disturbing the peaceful enjoyment of accommodations by other residents, and maintain their property in "decent, safe, and sanitary" conditions. 24 C.F.R. § 966.4(f)(6), (7), (9), (11). C.L.A.S.H. does not suggest that those kinds of requirements fall outside the Department's statutory authority. And C.L.A.S.H. points to no material distinction between those requirements and the Smoke Free Rule vis-à-vis a presumption against preemption.

C.L.A.S.H.'s reliance on the Supreme Court's recent decision in *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485 (2021), is off base. There, the Court held that the Director of the Centers for Disease Control and Prevention (CDC) almost certainly lacked authority under the Public Health Service Act to impose a nationwide moratorium on eviction of tenants in response to the COVID-19 pandemic. That holding rested on the specific terms of the statutory grant of authority, which the Court read to be focused on measures directly relating to the spread of the disease itself as opposed to the indirect, "downstream connection between eviction and the interstate

spread of disease." *Id.* at 2488. And the Court emphasized the "sheer scope of the CDC's claimed authority," which encompassed private landlords nationwide. *Id.* at 2489. Here, by contrast, the Smoke Free Rule falls directly—not indirectly—within the terms of the statutory grant of authority. And the Rule applies only in the specific setting of Department-funded public housing, a context in which the Housing Act expressly contemplates—indeed, requires—Departmental involvement.

C.L.A.S.H. gets no further in relying on *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000). There, the Court held that the Food and Drug Administration's statutory authority to regulate drugs and devices did not encompass the power to regulate tobacco products. The Court reasoned that Congress had shown in various ways that it intended to exclude tobacco products from the agency's jurisdiction, including through a history of tobacco-related legislation leaving no role for the FDA over tobacco products and through Congress's repeated rejection of legislation that would have granted the FDA the authority to regulate tobacco. *Id.* at 142–44, 147–49. C.L.A.S.H. points to no such legislative indicia here. And importantly, the *Brown & Williamson* Court emphasized the breadth of authority claimed by the agency, which encompassed the purported power to regulate an industry constituting a significant portion of the national economy and to ban the industry's products altogether. *Id.* at 159. This case, again, is decidedly different in that the Rule applies only to federally-funded public housing, a domain in which Congress has granted the Department the express authority to regulate dwelling conditions by setting health, safety, habitability, and maintenance standards.

2.

C.L.A.S.H. next contends that the Department's promulgation of the Smoke Free Rule was arbitrary, capricious, and an abuse of discretion. We disagree.

Under the arbitrary and capricious standard, we do not "substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The standard is met as long as there is a "rational connection between the facts found and the choice made." *Id.* And we "give an extreme degree of deference to the agency when it 'is evaluating scientific data within its technical expertise.'" *Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954–55 (D.C. Cir. 2007) (quoting *Hüls Am., Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996)).

Here, the Department documented considerable evidence substantiating the health, safety, and cost-saving benefits of the Rule. In terms of health, the Department found "the scientific evidence for the adverse health effects of SHS [secondhand smoke] exposure" to be "compelling." 81 Fed. Reg. at 87,441. The Department discussed, for instance, a report in which the "Surgeon General concluded that there is no risk-free level of exposure to SHS." *Id.* "In children," the Surgeon General found, secondhand smoke "exposure can cause sudden infant death syndrome, and can also cause acute respiratory infections, middle ear infections and more severe asthma." *Id.* And in adults, exposure "causes heart disease, lung cancer, and stroke," *id.*, resulting in the death of some 41,000 adult nonsmokers each year from lung cancer and heart disease, 80 Fed. Reg. at 71,763. Accordingly, secondhand smoke is considered a known human carcinogen. 81 Fed. Reg. at 87,441–442; *see generally* 80 Fed. Reg. at 71,763–764.

The Department also described the evidence demonstrating that, because of the way secondhand smoke moves through a building, "individuals living in multiunit housing can be exposed to SHS even if no one smokes in their households." 80 Fed. Reg. at 71,764. The Department referenced studies and surveys examining the migration of secondhand smoke in buildings, explaining that "SHS can move both from external hallways into apartments and between adjacent units." *Id.* Studies thus showed that children in non-smoking apartments had substantially higher levels of a nicotine metabolite in their blood than children living in non-smoking detached homes. *Id.* And while "improvements in ventilation systems" and "increased air sealing of units" can help reduce the movement of secondhand smoke through a building, "these strategies cannot fully eliminate exposure." 81 Fed. Reg. at 87,442. "Increased air sealing could also have the disadvantage of increasing SHS exposures to non-smokers in the sealed units, and could increase the amount of SHS that settles on surfaces within the sealed units." *Id.*

With regard to fire safety, the Department discussed the number of residential fires and resulting deaths and injuries caused by smoking and observed that "[s]moking is the leading cause of fire deaths in multiunit properties." 80 Fed. Reg. 71,764. As for maintenance costs, the Department determined that "the costs and benefits" are "compelling in terms of reduction in maintenance and unit turnover costs." 81 Fed. Reg. 87,438. Various surveys documented the substantial costs associated with fires and smoking damage, with the CDC estimating that a smoke-free policy in public housing would annually save some $43 million in renovation expenses and $16 million in averted fire losses. 80 Fed. Reg. 71,764.

C.L.A.S.H. asserts that the health risks from secondhand smoke to tenants living in other units are "scientifically dubious." C.L.A.S.H. Br. 50–51. But C.L.A.S.H. merely states without elaboration that the data is "inconclusive," and then summarily references, without any further discussion, what it describes as a list of "studies suggesting lack of transfer and lack of adverse health effects." *Id.* at 51–52. C.L.A.S.H. acknowledges, moreover, that its "list of studies were not in the record" before the agency. *Id.* at 52. Indeed, while C.L.A.S.H. provided certain comments to the Department during the comment period for the Rule, it submitted no scientific information and cited no studies supportive of its position. N.Y.C. C.L.A.S.H. Comment Letter on Proposed Rule Instituting Smoke-Free Public Housing, 80 Fed. Reg. 71,762 (proposed Nov. 17, 2015). And we generally do not consider information that was not before the agency when making its decision. *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014). C.L.A.S.H.'s conclusory statements questioning the evidence of health risks posed by secondhand smoke, finally, have no bearing at all on the Department's other rationales for the Rule—i.e., the interest in reducing the risk of catastrophic fires and in decreasing maintenance costs.

C.L.A.S.H. submits that the Department's stated health, safety, and cost-related reasons for the Rule are pretextual because the Department in fact desires only to stop tenants from smoking, not to improve air quality in their units. There is no support for that contention. Indeed, the Department expressly found "it important . . . to reiterate" that the Rule "does not prohibit individual PHA residents from smoking," and that "PHAs should continue leasing to persons who smoke." 81 Fed. Reg. at 87,432. The Department also specifically declined to bar the use of electronic nicotine delivery systems, reasoning in part that doing so would "not

necessarily reduce the risk of catastrophic fires or maintenance costs." *Id.* at 87,436.

C.L.A.S.H. also contends that the Department disregarded the risks faced by vulnerable tenants when venturing outside their units to smoke. C.L.A.S.H. Br. 49. But the record reflects that the Department considered those very risks and recommended ways to alleviate them. 81 Fed. Reg. at 87,434; *id.* at 87,434, 87,436.

In short, the Department adequately substantiated its rationales for the Rule and did not act arbitrarily and capriciously in promulgating it.

B.

We turn next to C.L.A.S.H.'s constitutional challenges, which we find to be uniformly without merit.

1.

C.L.A.S.H. first contends that the Rule amounts to an impermissible condition on federal spending under the Spending Clause. That Clause gives Congress the power to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. Under the Clause, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to 'further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and *administrative directives*.'" *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 459 (D.C. Cir. 2012) (emphasis in original) (citing *South Dakota v. Dole*, 483 U.S. 203, 206 (1987)).

But the ability to attach conditions on federal spending is "not unlimited." *Dole*, 483 U.S. at 207. The Supreme Court has set out "several general restrictions" that a spending condition must meet: first, the condition "must be in pursuit of the general welfare"; second, it must be "unambiguous[]," such that recipients can make a "knowing[]" choice to participate, "cognizant of the consequences of their participation"; third, it must be related "to the federal interest in particular national projects or programs"; and fourth, it must comply with any "other constitutional provisions that may provide an independent bar to the conditional grant of federal funds." *Id.* at 207–08 (citations and quotation marks omitted).

C.L.A.S.H. argues that the Rule infringes the second *Dole* factor, which requires conditions on federal funding to be unambiguous in a manner giving funding recipients adequate notice of the consequences of their participation. C.L.A.S.H. does not suggest that there is any ambiguity about whether funding recipients must comply with the Department's housing quality standards. C.L.A.S.H.'s argument instead is that the Smoke Free Rule is impermissibly ambiguous because it vests discretion in the Department with respect to the consequences for noncomplying PHAs. On that score, the Rule states: "If HUD determines that a PHA is not in compliance with its plan, HUD will take whatever action it deems necessary and appropriate." 81 Fed. Reg. at 87,437.

The governing contracts between the Department and a PHA, however, clearly set forth the consequences for "a serious and material violation of any one or more of the covenants contained" in the agreement—which generally include the Department's regulations, and which specifically include the "failure to maintain and operate the project(s) under [the contract] in a decent, safe, and sanitary manner." Form

HUD-53012A, §§ 5, 17(B), J.A. 156, 158, 162–63. If a PHA commits such a violation, the Department may take title to the project, take possession and control of it, terminate the contract, or seek other remedies at law. *Id.* § 17(E)–(F), J.A. 163. Before exercising any such remedy, the Department must provide a notice of default to the PHA, including a period in which to cure, and the PHA has a right to an administrative appeal. *Id.* § 17(C). Those potential penalties are longstanding and not specific to the Rule at issue here, and any participating PHA knows of the potential consequences when entering into a contract. PHAs thus accept federal funds fully aware of the potential consequences if they violate the Rule.

C.L.A.S.H. also briefly contends that the Rule infringes the third *Dole* factor, which requires conditions on the receipt of federal funds to be related "to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207. C.L.A.S.H. characterizes the Rule as out of step with the statute's delegated authority to the Department. C.L.A.S.H.'s argument in this respect thus essentially restates its argument that the Rule lies outside the Department's statutory authority, which we have already addressed and rejected.

C.L.A.S.H. additionally asserts that the Rule imposes a "financial inducement" that is "so coercive as to pass the point at which pressure turns into compulsion." *Id.* at 211 (quotation marks omitted). But C.L.A.S.H. cites no evidence about funding levels demonstrating that the Rule could be considered coercive in the constitutional sense, nor did it do so before the district court. *Compare Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581–82 (2012) (*NFIB*) (plurality opinion).

Finally, relying on the plurality opinion in *NFIB*, C.L.A.S.H. contends that the spending condition is an impermissible "shift in kind" to the preexisting public housing

program. *See id.* at 583. Congress, though, may permissibly "make adjustments" to a federal program. *Id.* In C.L.A.S.H.'s view, the Rule unconstitutionally transforms PHA's obligations from providing safe housing infrastructure "to micromanaging tenants' private lives." C.L.A.S.H. Br. 17. But PHAs agree in their contracts to abide by future amendments to Departmental regulations, Form HUD-53012A § 5, J.A. 158, and the Rule is in keeping with other obligations imposed by the Department on public housing tenants.

Under the Department's preexisting regulations, for instance, PHA leases already require tenants "[t]o keep the dwelling unit . . . in a clean and safe condition," 24 C.F.R. § 966.4(f)(6), and "[t]o dispose of all ashes, garbage, rubbish, and other waste from the dwelling unit in a sanitary and safe manner," *id.* § 966.4(f)(7). Tenants must also agree "[t]o abide by necessary and reasonable regulations promulgated by the PHA for the benefit and well-being of the housing project and the tenants." *Id.* § 966.4(f). And tenants must further "assure that no member of the household engages in an abuse or a pattern of abuse of alcohol that affects the health, safety, or right to peaceful enjoyment of the premises by other residents." *Id.* § 966.4(f)(12)(iii).

C.L.A.S.H.'s attempt to analogize the Rule to the legislation considered in *NFIB* is inapt. Before the enactment of the Affordable Care Act, the Medicaid program required states to cover only certain discrete categories of individuals— pregnant women, children, needy families, the blind, the elderly, and the disabled. The Act's Medicaid expansion, invalidated by the Supreme Court as an impermissible "shift in kind," required States to expand their programs to cover *all* individuals under the age of 65 with incomes below 133 percent of the federal poverty line. *NFIB*, 567 U.S. at 575– 76 (plurality opinion). That was viewed to amount to an

entirely "new health care program." *Id.* at 584. Unlike the Medicaid expansion at issue in *NFIB*, the Smoke Free Rule does not fundamentally transform the nature of the public housing program or expand the population served.

Moreover, the operative inquiry concerns whether the new condition "surpris[es] participating States with post-acceptance or 'retroactive' conditions." *See id.* (quotation marks and citation omitted). Here, PHAs were on notice that the Department might make adjustments to the terms of the program: the contract states that it "incorporates by reference . . . those regulations issued by HUD for the development, modernization, and operation of public and Indian housing projects . . . ." Form HUD-53012A, J.A. 156. PHAs thus knew that they could be subject to future Department regulations. And as explained, PHAs were also on notice of the consequences resulting from violating applicable Departmental rules and regulations.

Because we find that the Rule is a valid exercise of the federal government's power under the Spending Clause, we have no need to reach C.L.A.S.H.'s arguments about the scope of the Commerce Clause.

2.

C.L.A.S.H. contends that the Smoke Free Rule commandeers the States in violation of the Tenth Amendment. Under the Tenth Amendment, "the Federal Government may not compel the States to enact or administer a federal regulatory program." *Printz v. United States,* 521 U.S. 898, 933 (1997) (quoting *New York v. United States,* 505 U.S. 144, 188 (1992)); *see also New York,* 505 U.S. at 176–77; *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018). The Rule, however, leaves the choice to the States of whether to

accept federal public housing funding and its attached conditions. The Rule neither commands the States directly to take any actions nor compels the involvement of state officials in a regulatory scheme. The Rule therefore does not infringe the Tenth Amendment's anti-commandeering principle.

3.

C.L.A.S.H. argues that the Rule violates the Fourth Amendment by permitting unconstitutional searches. The Rule, however, does not contain any type of new authorization to search premises. Instead, the Rule by its terms leaves enforcement up to the discretion of each PHA. *See* 81 Fed Reg. 87,437. The Department's preexisting regulations require PHAs to identify the circumstances under which they may enter the dwelling unit during the tenancy, including for routine inspections, and to provide written notice before entering a dwelling absent a reasonable belief that there is an emergency. 24 C.F.R. § 966.4(j). And the Department Guidebook specifically states that "*[t]enants cannot be asked to waive their Fourth Amendment rights*" and that it "does not authorize PHAs or police departments to enter units for security purposes unless the police department has a search warrant or they are in hot pursuit of a suspect who has run into the unit." J.A. 170 (emphasis added).

4.

In its last constitutional challenge, C.L.A.S.H. submits that the Rule violates tenants' "fundamental due-process right [under the Fifth Amendment] to engage in legal activities within the privacy of their homes." C.L.A.S.H. Br. 29. But C.L.A.S.H. identifies no authority establishing such a right. The federal decisions C.L.A.S.H. cites involve the exercise of First Amendment rights or "personal decisions relating to

marriage, procreation, contraception, family relationships, child rearing, and education." *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 574 (2003); *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65, 69 (1973). And the state decisions C.L.A.S.H. cites rely on state constitutional privacy protections, not federal due process guarantees. *See, e.g.*, *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975).

Because the Rule does not impinge on a fundamental right, C.L.A.S.H. must show that the Rule's requirements bear no rational relationship to a legitimate state interest. *E.g., Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007). The Supreme Court has expressly held that the protection of tenants is a legitimate state interest. *See Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988). And the Rule, intended to reduce health and safety risks to tenants, readily passes muster under the forgiving rational basis test. *See Williamson v. Lee Optical of Okla. Inc.*, 348 U.S. 483, 487–88 (1955).

## III.

We last briefly address C.L.A.S.H.'s appeal from the district court's denial of certain post-judgment motions. C.L.A.S.H.'s post-judgment motion for reconsideration and amendment of the judgment simply reprises arguments we have already considered and rejected. C.L.A.S.H. also moved under Rule 15(b)(2) to amend its complaint to introduce the argument that the threat of losing public housing funding is unconstitutionally coercive. The district court did not err in denying a motion to amend the complaint brought after judgment had already been entered (and in any event, as explained above, C.L.A.S.H. included no evidence in its motion showing that the threat of losing the funding at issue reached the level of unconstitutional coercion).

\* \* \* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*