Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 4, 2010            Decided March 19, 2010

No. 08-1241

NATIONAL MINING ASSOCIATION,
PETITIONER

v.

MINE SAFETY AND HEALTH ADMINISTRATION AND
SECRETARY OF LABOR,
RESPONDENTS

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND
SERVICE WORKERS INTERNATIONAL UNION,
INTERVENOR

———

Consolidated with No. 09-1087

———

On Petitions for Review of an Order
of the Federal Mine Safety & Health Administration

———

*Daniel W. Wolff* argued the cause for petitioner National Mining Association. With him on the briefs were *Thomas C. Means* and *Edward M. Green*.

*Henry Chajet* argued the cause and filed the briefs for petitioner Methane Awareness Resources Group.

*Edward D. Sieger*, Senior Appellate Attorney, U.S. Department of Labor, argued the cause for respondents the Secretary of Labor and Mine Safety and Health Administration. With him on the brief were *Deborah Greenfield*, Acting Deputy Solicitor of Labor, and *W. Christian Schumann*, Counsel.

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for respondent National Institute for Secretary of Health and Human Services and National Institute for Occupational Safety and Health. With him on the brief was *Mark B. Stern*, Attorney. *Dana J. Martin*, Attorney, entered an appearance

Before: ROGERS and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: The National Mining Association ("NMA") and the Methane Awareness Resources Group ("MARG") (hereinafter, together "industry") petition for review of the Mine Safety and Health Administration's ("MSHA's") decision to enforce a final exposure limit standard addressing health risks presented by exposure of miners in metal and non-metal underground mines to diesel particulate matter ("DPM") in diesel exhaust. The decision, announced May 20, 2008, represented a change in MSHA's earlier expressed intent to issue a proposed rule to convert the final DPM exposure

standard from a total carbon ("TC") to an elemental carbon ("EC") measurement.  *See Diesel Particulate Matter Exposure, Notice of Enforcement of DPM Final Limit and Withdrawal of Intent to Issue Proposed Rule*, 73 Fed. Reg. 29,058 (May 20, 2008) ("2008 Notice").  On the same date, MSHA issued Program Policy Letter P08-IV-01 ("2008 Policy Letter") describing how it intended to enforce the DPM standard. Industry contends MSHA's decision was arbitrary and capricious because inadequately explained and unsupported by scientific data, contrary to a 2002 settlement and to MSHA's statements to this court, and without public notice or opportunity to comment.  MARG individually challenges the failure of the National Institute of Occupational Safety and Health ("NIOSH") to release a study on DPM.  For the reasons that follow, we deny the industry petitions and dismiss MARG's individual challenges for lack of jurisdiction.

## I.

The Mine Act provides that MSHA shall "develop, promulgate, and revise as may be appropriate, improved mandatory health or safety standards for the protection of life and prevention of injuries in coal or other mines."  30 U.S.C. § 811(a).  For "toxic materials or harmful physical agents," MSHA "shall set standards which most adequately assure on the basis of the best available evidence that no miner will suffer material impairment of health or functional capacity" and, "[i]n addition to the attainment of the highest degree of health and safety protection for the miner, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws."  *Id.* § 811(a)(6)(A).  A new mandatory health or safety standard may not provide less protection to miners than an existing mandatory standard.  *Id.* § 811(a)(9).  A person adversely affected by a mandatory health or safety standard

promulgated under section 811 may petition for judicial review of the standard within 60 days after the standard is promulgated. *Id.* § 811(d).

Based on an assessment of the risk to miners of adverse health effects from DPM, MSHA promulgated a rule in January 2001 limiting the airborne concentration of DPM in underground metal and non-metal mines. *See Diesel Particulate Matter Exposure*, 66 Fed. Reg. 5706 (Jan. 19, 2001) ("2001 Rule"). The 2001 Rule set both interim and final DPM concentration standards, using TC measurements as a surrogate for measuring DPM; the interim DPM standard was to take effect in July 2002. *Id.* at 5706–07, 5726–27. The concentration limits were expressed as the number of micrograms of TC per cubic meter of air. After several petitions for review of the 2001 Rule were filed (including petitions by NMA and MARG), MSHA entered into a settlement agreement in July 2002 postponing the effective date of the interim DPM standard of 400 TC from July 2002 to July 2003, and requiring MSHA to propose an expedited rulemaking to change the DPM surrogate from TC to EC; the pending petitions for review were to be dismissed upon completion of the expedited rulemaking. *See Diesel Particulate Matter Exposure*, 67 Fed. Reg. 47,296, 47,297–99 (July 18, 2002) ("2002 Settlement").

Thereafter MSHA revised the 2001 Rule twice. In 2005, based on scientific data showing a TC:EC ratio of 1.3:1 for converting EC measurements to TC measurements at certain TC concentrations, MSHA converted the interim DPM standard from 400 TC to 308 EC. *See Diesel Particulate Matter Exposure*, 70 Fed. Reg. 32,868, 32,870 (June 6, 2005) ("2005 Rule"). MSHA explained that although the scientific data indicated this single, constant conversion factor was appropriate at 400 TC, the data were not adequate to convert the final DPM standard of 160 TC to an EC measurement. *Id.*; *see also Diesel*

*Particulate Matter Exposure, Proposed Rule*, 70 Fed. Reg. 53,280, 53,287 (Sept. 7, 2005) ("2005 Proposed Rule"). In 2006, MSHA postponed the effective date of the final DPM standard of 160 TC from January 2006 to May 20, 2008, and set an interim standard of 350 TC to become effective in January 2007. *See Diesel Particulate Matter Exposure*, 71 Fed. Reg. 28,924, 28,978 (May 18, 2006) ("2006 Rule"). MSHA reiterated that the scientific data were not adequate for converting the final DPM standard of 160 TC to EC and stated that it intended to consider the TC-to-EC conversion in a separate rulemaking. *Id.* at 28,976, 28,983.

In February 2007, this court upheld the 2001, 2005, and 2006 Rules setting DPM standards. In *Kennecott Greens Creek Mining Co. v. MSHA*, 476 F.3d 946 (D.C. Cir. 2007), the court rejected challenges to the sufficiency of evidence of health risk for miners from DPM and to compliance feasibility for mine operators, and concluded MSHA reasonably chose TC as a surrogate for measuring DPM in view of evidence of their tight correlation and the fact that MSHA has a reliable method for determining the amount of TC in a sample. *Id.* at 955. The court also rejected claims that MSHA was arbitrary and capricious in not converting to EC the interim DPM standard of 350 TC and the final DPM standard of 160 TC, as MSHA had done in 2005 for the interim DPM standard of 400 TC. The court observed that "MSHA has clearly stated in its rules that TC can still serve as a consistent and reliable surrogate for DPM as long as samples are taken in areas away from tobacco smoke and oil mist." *Id.* at 956. The court noted MSHA had stated it would initiate a new rulemaking regarding conversion of the final standard from TC to EC. The court concluded:

> In sum, MSHA has concluded that EC is a *better* proxy for DPM than TC, but this does not automatically render the use of TC to be arbitrary and capricious.

> Even though TC sampling is more difficult than EC sampling, MSHA has reasonably determined that TC can still be a reliable proxy for DPM as long as samples are taken in the proper manner. In any event, MSHA's rulemaking suggests that it has no intention of using TC as a stand alone proxy.

*Id.*

On May 20, 2008, MSHA gave public notice of its decision to enforce the final DPM standard of 160 TC and to withdraw its intent to propose a rule converting 160 TC to EC. 2008 Notice, 73 Fed. Reg. at 29,058–59. In the 2008 Notice, MSHA explained that the latest available scientific evidence did not identify a single, constant conversion factor for EC below 230 TC. *Id.* at 29,059. It referenced an article about a study of four underground mines (two stone mines and two metal mines), which stated that the correlation between TC and EC varies below 230 TC and that the TC:EC ratio is highly variable below 160 TC. J.D. Noll et al., *Relationship between Elemental Carbon, Total Carbon, and Diesel Particulate Matter in Several Underground Metal/Non-metal Mines*, 41 Envtl. Sci. & Tech. 710, 715 (2007) ("Noll-Bugarski Study"); *see* 2008 Notice, 73 Fed. Reg. at 29,059. It also referenced a consultant's report advising that because the Noll-Bugarski Study showed that the variability of the TC:EC ratio increases as DPM levels decrease, EC measurements would not be an appropriate surrogate for DPM at 160 TC; the report discussed four sampling strategies for enforcing the 160 TC standard. J. Kogut, *Alternative Strategies for Enforcing a DPM Exposure Limit* 1 (Sept. 2007) ("Kogut Report"); *see* 2008 Notice, 73 Fed. Reg. at 29,059–60. The 2008 Notice stated that MSHA would provide a "protocol for calculating a location specific adjustment" to a miner's personal sample based on TC and EC measurements. 73 Fed. Reg. at 29,059. On the same date, May 20, 2008, MSHA also

issued the 2008 Policy Letter describing how it intended to use a miner's personal TC sample and samples from areas of a mine to validate whether the miner's DPM exposure had exceeded the 160 TC standard. Industry filed petitions for review; NMA filed a petition in this court and MARG then filed a petition in the Fifth Circuit, which granted MSHA's motion to transfer MARG's petition to this court.

## II.

Industry contends that in withdrawing the promised rulemaking and simultaneously issuing its enforcement strategy, MSHA failed to provide an adequate explanation, relied on a scientific article and a consultant's report that do not address whether identifying a TC:EC conversion factor is too difficult, and directly contradicted what MSHA had told this court in 2007. Further, industry notes, MSHA had agreed as part of the 2002 Settlement to propose a final DPM standard that used EC instead of TC as a DPM surrogate. In these circumstances, industry contends that MSHA should be required to provide notice and afford the public an opportunity to comment on the basis for its change of position, and seeks a stay of the 160 TC standard and a remand of MSHA's rulemaking withdrawal and enforcement strategy publication with instructions to MSHA to engage in further notice-and-comment rulemaking.

This court has jurisdiction under the All Writs Act, 28 U.S.C. § 1651, to review industry's challenge to the 2008 Notice on the ground that MSHA was arbitrary and capricious in deciding not to propose a rule to convert the final DPM standard of 160 TC to EC. The All Writs Act provides that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions." *Id.* § 1651(a). As this court explained in the context of MSHA's withdrawal of a proposed rule in *International Union, United Mine Workers of America v. U.S.*

*Department of Labor*, 358 F.3d 40, 43 (D.C. Cir. 2004), "the withdrawal of a proposed rule defeats this [c]ourt's prospective jurisdiction" because such withdrawal is similar to unreasonable delay of agency action. This court's authority to review the withdrawal of MSHA's published intention to propose a rule to convert the final DPM standard of 160 TC to EC is a similar "necessary implication" of the court's jurisdiction to address claims of unreasonable agency delay in order to protect the court's prospective jurisdiction over the final rule resulting from the promised proposed rule. *Id.* Upon applying the arbitrary and capricious standard of review, *see id.*, we conclude MSHA was not arbitrary and capricious in issuing the 2008 Notice.

"'[A]n agency's refusal to institute rulemaking proceedings is at the high end of the range' of levels of deference we give to agency action under our 'arbitrary and capricious' review." *Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 919 (D.C. Cir. 2008) (quoting *Am. Horse Prot. Ass'n, Inc. v. Lyng*, 812 F.2d 1, 4–5 (D.C. Cir. 1987)). The 2008 Notice advised that MSHA would enforce the final DPM standard of 160 TC and not convert it to EC because MSHA "could not identify a single, constant conversion factor for EC at any level below 230 TC." 2008 Notice, 73 Fed. Reg. at 29,059. MSHA's decision has ample support in the record. MSHA explains that, consistent with the efficiency requirements for instituting a rulemaking, *see* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993), and the Mine Act's requirement that a new mandatory health or safety standard may not provide less protection to miners than an existing mandatory standard, *see* 30 U.S.C. § 811(a)(9), it did not institute a rulemaking to convert the DPM standard of 160 TC to EC because it lacked scientific data necessary to identify a single, constant EC conversion factor that would ensure no impairment of the miner protection achieved under the DPM standard of 160 TC. In the 2005 Proposed Rule MSHA alerted industry (and others) generally that the TC:EC conversion ratio

of 1.3 might not apply at DPM concentrations lower than 400 TC and requested comments on how to make the conversion. *See* 2005 Proposed Rule, 70 Fed. Reg. at 53,287. In response, NMA and several mine operators agreed more scientific research was needed, while MARG argued the DPM standard of 160 TC could not be converted to EC and should be deleted from the DPM rule.[1] The year after this court's 2007 decision in *Kennecott*, MSHA concluded that the latest available scientific evidence appeared in the February 2007 Noll-Bugarski Study, whose authors had found that the variability of the TC:EC ratio increases below 230 TC. *See* 2008 Notice, 73 Fed. Reg at 29,059. In the absence of other data MSHA thus concluded it could not identify a single, constant TC:EC conversion factor below 230 TC. *See id.* NIOSH agreed that MSHA's evidence did not allow identification of a constant TC:EC conversion factor below 230 TC. In these

---

[1] The comments included NMA's statement that "NMA must insist that . . . the final outcome of the rulemaking to be conducted by MSHA on a TC to EC conversion factor will result in an accurate, scientifically supportable conversion factor." The Stillwater Mining Company commented that "Stillwater believes that additional research is needed in order to determine an appropriate conversion factor." So too, the FMC Corporation commented that it "respectfully suggests that MSHA wait for the NIOSH . . . study report to be issued so that NIOSH can share their scientific determination of the potential risks and feasibility related to DPM." And Kennecott Greens Creek Mining Company and its parent Kennecott Minerals Holding Company ("KMC") commented that they "agree with MSHA that more work is required to develop an appropriate conversion factor from TC to EC for the proposed phased-in final limits. . . . [I]dentifying an accurate, scientifically supportable, and peer-reviewed conversion factor is absolutely fundamental to KMC's acceptance of any staggered effective date schedule." MARG stated that "the proposed conversion of TC limits to EC limits is not feasible" and that it "is hopeful that MSHA will finally correct its flawed rules, by deleting the 160 limit."

circumstances, MSHA could reasonably conclude it lacked a way to convert the TC standard to EC at the 160 TC level using a constant conversion factor.

Industry properly acknowledges that MSHA can abandon a prior contemplated course of action if it offered an adequate explanation. *See Int'l Union, UMWA*, 358 F.3d at 45. But industry contends MSHA's explanation was superficial, implausible, and contrary to facts of record. Specifically NMA maintains that neither the Noll-Bugarski Study nor the Kogut Report support MSHA's May 20, 2008 decision. The Noll-Bugarski Study, as NMA suggests, was limited to the actual in-mine data of only four mines, which the authors acknowledged did not necessarily provide a good representation of all metal/non-metal mines. *See* Noll-Bugarski Study, 41 Envtl. Sci. & Tech. at 715. True enough, but this does not meet MSHA's point that the Noll-Bugarski Study was the latest scientific evidence. *See* 2008 Notice, 73 Fed. Reg. at 29,059.

Contrary to industry's view, there was no inconsistency between MSHA's position in *Kennecott* that it could enforce the DPM standard of 160 TC and its statement in 2006 that to enforce the standard it needed "to validate a TC sample result, which cannot be done without an appropriate conversion factor for EC at that level," 2006 Rule, 71 Fed. Reg. at 28,976. As MSHA states in its brief, "[i]n context, the statement addressed MSHA's inability to identify a practical sampling strategy that would adequately remove organic carbon interferences," MSHA Resp't Br. 21, and was not, as industry asserts, a statement that MSHA could not enforce the DPM standard of 160 TC without converting it to EC. The Kogut Report provided MSHA with practical sampling strategies to enforce the DPM standard of 160 TC and thus supported MSHA's decision to enforce this standard. NMA misses the mark when objecting that the Kogut Report provided no support for MSHA's decision to enforce the

DPM standard of 160 TC because it did not address the feasibility of finding a TC:EC conversion factor. Although NMA claims that MSHA should have done further work on the EC conversion instead, it was within MSHA's discretion, given the data available, simply to allow the 160 TC standard to take effect under the previously promulgated rule rather than to embark on a conversion of that standard to EC. *See Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1222 (D.C. Cir. 1983).

Industry also contends that MSHA acted arbitrarily because its decision not to proceed with a rulemaking on converting the 160 TC standard to EC flies in the face of the rulemaking promise MSHA made in its brief to this court in *Kennecott*. However, MSHA's brief to the court addressed several options open to the court in disposing of the petitions in *Kennecott*, one of which was to uphold the DPM standard of 160 TC, *see Kennecott*, Resp'ts Br. 32–36, 2006 WL 3622119, which is what the court did. This hardly indicates MSHA misled the court into thinking the validity of the DPM standard of 160 TC was contingent on its conversion to EC. To the extent NMA suggests the court in *Kennecott* took "some comfort," Pet'r NMA Br. 21, that upholding the reasonableness of the final TC standard would be of limited consequence in the long run because MSHA had "no intention of using TC as a stand alone proxy," *Kennecott*, 476 F.3d at 956, NMA reads into the court's holding a qualification that is not there. The court simply recognized that the DPM standard of 160 TC could have a limited impact if MSHA made the EC conversion or, if MSHA did not make the conversion, that it could be enforced with additional sampling strategies. And the fact that MSHA offered—and the court in *Kennecott* rejected—the option of declining to rule on the final TC standard because of the likelihood that it would be converted to EC does not render the 2008 Notice an arbitrary and capricious "withdraw[al] from a

promised action without notice and comment." Pet'r NMA Br. 23. The analogy NMA suggests to *Weaver v. U.S. Information Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996), where an agency adopted an interpretation of a rule that it urged upon the court and the opposing party, and so was bound by that position in the future unless it explained the basis for a contrary position, is inapt.

MSHA's "pledge" to convert 160 TC to EC, Pet'r NMA Br. 23, was conditioned on having scientific data to support a conversion for EC at low TC levels. *See* 2005 Rule, 70 Fed. Reg. at 32,870 (converting the 400 TC interim DPM standard to 308 EC but stating "evidence in the record is inadequate for MSHA to make determinations regarding revisions to the final DPM limit" standard of 160 TC); 2005 Proposed Rule, 70 Fed. Reg. at 53,287 (suggesting the 1.3 TC:EC conversion factor may not be appropriate for 160 TC and requesting comments on using EC and TC measurements); 2006 Rule, 71 Fed. Reg. at 28,983 (concluding the DPM rulemaking record was inadequate for converting 160 TC to EC, and stating MSHA's intent to consider TC and EC conversion comments in a separate 160 TC conversion rulemaking). The record indicates that MSHA did not have the needed data to identify a TC:EC conversion constant at 160 TC before the final DPM standard of 160 TC was to take effect in May 2008. Thus, in the 2008 Notice, MSHA stated it had concluded "insufficient data exist to proceed with further rulemaking to convert the DPM final limit using a single, constant conversion factor" based on the "latest scientific evidence" in the Noll-Bugarski Study that the TC:EC ratio varies below 230 TC, but indicated that MSHA "will continue to monitor and encourage research in this field." 73 Fed. Reg. at 29,059–60.

NMA's suggestion that MSHA's "misrepresentations," Pet'r NMA Br. 22, albeit unintentional, cast a cloud over the

legitimacy of the DPM standard of 160 TC does not advance its position.  In *Kennecott* the court upheld the DPM standard, and MSHA's options for its effective enforcement improved with the Kogut Report.  Contrary to NMA's view, MSHA in May 2008 was thus not "exactly where it was in 2006," Pet'r NMA Br. 23, with respect to reliable enforcement of the DPM standard of 160 TC in the absence of an EC conversion factor.  Instead, what NMA mistakenly characterizes as MSHA's prior "commit[ment] to an EC standard rulemaking for the final [DPM standard] as a matter of necessity," *id.* at 22, had evolved upon receipt of the latest scientific data.

Industry is on no firmer ground in contending that the 2008 Notice's withdrawal of MSHA's rulemaking intent violated the terms of the 2002 Settlement arising from challenges to the 2001 Rule.  It is true that MSHA agreed in the 2002 Settlement to propose a final DPM exposure limit that used EC as the DPM surrogate.  However, industry repudiated the 2002 Settlement when it petitioned  for review of the 2001 Rule in *Kennecott*. *See Village of Kaktovik v. Watt*, 689 F.2d 222, 231 (D.C. Cir. 1982).  NMA retreats from this contention in its reply, presumably recognizing it is not in a position to bind MSHA to a settlement NMA repudiated.  MARG considers MSHA to be still bound by the 2002 Settlement's provision requiring completion of the EC rulemaking before dismissal of the pending DPM petitions, but the issues in the pending petitions were litigated in *Kennecott*; even if MSHA had completed the contemplated EC rulemaking there would be no pending petitions to dismiss.  As the court noted in *Village of Kaktovik*, 689 F.2d at 231, "[a] live and enforceable settlement simply cannot coexist with a party's efforts to acquire a court determination of the very issues the settlement was supposed to resolve without litigation."  MSHA was no longer bound by the 2002 Settlement when it issued the 2008 Notice.

NMA is mistaken when it suggests that on the basis of the Noll-Bugarski Study, MSHA effectively "repromulgated the 160 TC standard." Pet'r NMA Br. 19. The DPM standard of 160 TC was set to take effect on May 20, 2008 pursuant to the 2006 Rule upheld in *Kennecott*. *See* 30 C.F.R. § 57.5060(b)(3); 2006 Rule, 71 Fed. Reg. at 29,012. Absent a stay or amendment to the 2006 Rule, the final DPM standard of 160 TC would take effect by operation of law irrespective of the 2008 Notice and so the 2008 Notice was not a repromulgation requiring notice and comment under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. As the court observed in *ICORE, Inc. v. FCC*, 985 F.2d 1075, 1082 (D.C. Cir. 1993), an agency does not enact a new rule when a transition rule expires or when the agency decides not to modify a rule, states that additional study is needed, or concludes that no new transition rule is needed.

Finally, industry contends the 2008 Notice's withdrawal of MSHA's rulemaking intent was unlawful because MSHA did not provide notice of or opportunity for comment on its action as required by the Mine Act, 30 U.S.C. § 811(a), and the APA, 5 U.S.C. § 553. In industry's view MSHA substituted for the promised EC standard the 2008 Notice's enforcement strategy, without giving prior public notice or opportunity for comment on either its intent to do so or the data on which it relied. NMA contrasts this circumstance with what would have happened if the Noll-Bugarski Study and the Kogut Report had been part of the rulemaking record in *Kennecott.* It cites *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 239 (D.C. Cir. 2008), where the court held the agency had to make public and available for comment those studies on which it relied, including the redacted pages on which the agency claimed not to have relied. This contention, as framed by NMA, does not challenge MSHA's failure to afford notice of and opportunity to comment on the 2008 enforcement strategy itself, but rather MSHA's failure to afford notice of and opportunity to comment on the

Noll-Bugarski Study and the Kogut Report before dropping the idea of issuing a notice of proposed rulemaking. *See* Pet'r NMA Br. 1-2, 8, 28, 30. (Although NMA states in a footnote in its principal brief that MSHA "also promulgated, again with no opportunity for notice and comment, a complex six-page program policy letter," Pet'r NMA Br. 29 n.7, this footnote statement is not sufficient to preserve the issue. *See Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997).)

NMA contends that MSHA failed to comply with required notice and comment procedures by withdrawing its intent to propose a TC to EC conversion rulemaking and simultaneously issuing an enforcement strategy for the DPM standard of 160 TC "without giving prior notice of, and an opportunity to comment on, their intent to do so or the data that informed that decision." Pet'r NMA Br. 2. However, the 2008 Notice was not subject to APA notice and comment procedures. It neither enacted a new rule, since the 160 TC standard would have replaced the interim DPM standard on May 20, 2008 regardless of the 2008 Notice, nor modified the 160 TC standard, and "*[n]ot* modifying a rule is not the same as 'formulating, amending, or repealing a rule,' the APA definition of 'rule making'" provided by 5 U.S.C. § 551(5). *See ICORE*, 985 F.2d at 1082. In addition, MSHA's statement in the 2006 Rule that it intended to propose a rulemaking to convert the 160 TC standard to EC is similar to the comment in a rulemaking by the agency in *ICORE* that further study was needed. The court in *ICORE* held that "[a]n agency statement in one rulemaking, that a pending study may generate need for another, neither initiates a second rulemaking nor cancels the timetable adopted in the first rulemaking." *Id.* Nor did MSHA adopt a new rule when it concluded in the 2008 Notice that no EC conversion was needed for the 160 TC standard. *Id.* NMA's reliance on rulemaking precedent such as *American Radio Relay League*, 524 F.3d 227, in maintaining

that MSHA had to disclose critical factual data, is thus inapposite. Moreover MSHA, while claiming on appeal that it was not legally obligated to disclose the data, notes that the Noll-Bugarski Study was published and made available on NIOSH's website, and that in April 2009 MSHA released the unredacted Kogut Report as well. *See* Resp't MSHA Br. 13 n.2 & 26 n.3; Pet'r NMA Br. 9 n.3.

## III.

MARG individually contends this court should order NIOSH to comply with the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2, and prior court orders by providing Congress, MARG, and intervenor union with information involving NIOSH's study. It also individually contends this court should order NIOSH to release its study to MSHA and the public, and should remand the instant case to MSHA with instructions to reopen the DPM rulemaking, add the NIOSH study to the rulemaking record, and consider this study in promulgating final DPM rules. To accomplish this goal, MARG has joined NIOSH and its parent the U.S. Department of Health and Human Services ("HHS") as respondents. We must dismiss these requests for lack of jurisdiction.

First, NIOSH and HHS are not proper respondents for two reasons. Under the Mine Act, petitions for review are authorized to the extent they challenge the validity of a U.S. Department of Labor mandatory health or safety standard promulgated pursuant to the Mine Act. 30 U.S.C. § 811(d). Although NIOSH is authorized by 29 U.S.C. § 671(c)(1) to "develop and establish recommended occupational safety and health standards," this provision is not part of the Mine Act. The Mine Act references NIOSH and HHS as providers of information to MSHA, *see* 30 U.S.C. § 811(a)(1), but it does not provide a basis for naming respondents other than the agency

that promulgated the challenged standard. Under section 811(d), a petition challenging a MSHA standard may be filed only if the petitioner is adversely affected by a mandatory Department of Labor health or safety standard promulgated pursuant to section 811 and the petition is challenging the validity of that standard.

In a similar situation, the court held in *Bangor Hydro-Electric Co. v. FERC*, 78 F.3d 659, 661–62 (D.C. Cir. 1996), that although the U.S. Department of the Interior was authorized to participate in and have its views made part of a FERC order, only FERC was a proper respondent where the Federal Power Act, 16 U.S.C. § 825*l*(b), provided for review of a petition filed by a person aggrieved by the order issued by FERC and asking that the FERC order be modified or set aside. Similarly, as NIOSH suggests, only Department of Labor entities can be proper respondents to a petition filed pursuant to the Mine Act, 30 U.S.C. § 811(d). *Cf. Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 694 F.2d 1289, 1298 (D.C. Cir. 1982). Although MARG asserts NIOSH is a proper respondent because the validity of MSHA's DPM rule depends on the information MSHA considered, the contents of the rulemaking record must be resolved in litigation with MSHA itself. Statutes such as the Mine Act and the Federal Power Act authorizing rulemaking contributions by other agencies do not thereby make the other agencies parties in a subsequent judicial challenge. *See, e.g.*, *Bangor Hydro-Elec.*, 78 F.3d at 662. If MARG prevailed here, the result would be a remand to MSHA. Thus, consistent with our precedent, only MSHA and its parent, the Department of Labor, are proper respondents. NIOSH and HHS are powerless to rescind a mandatory health or safety standard promulgated by MSHA, and their participation as respondents serves no meaningful purpose.

Additionally, pursuant to Federal Rule of Appellate Procedure 15,[2] the agency to be named as a respondent to a petition challenging an agency order is the parent agency and its subparts that promulgated the challenged action. *See Ingalls Shipbuilding, Inc. v. Dir., Office of Workers' Compensation Programs*, 519 U.S. 248, 267 (1997). MARG's individual petition challenges MSHA's 2008 Notice and 2008 Policy Letter, which MARG styles as a "final rule." Pet'r MARG Br. ii. But as *Ingalls Shipbuilding* makes clear, MARG properly named only MSHA and its parent the Department of Labor as respondents. Therefore, we dismiss NIOSH and HHS as respondents.

Second, regarding the FACA claim, insofar as MARG seeks enforcement of the order issued by the U.S. District Court for the Western District of Louisiana, *see MARG v. United States*, No. 96-2430 (W.D. La. June 5, 2001), its request must be directed to that court. *See Baker ex rel. Thomas v. General Motors Corp.*, 522 U.S. 222, 236 (1998); *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1487–88 (D.C. Cir. 1992). This court lacks jurisdiction.

Third, to the extent MARG maintains NIOSH has unreasonably delayed publication of its DPM study and seeks to compel agency action unreasonably delayed, its claim must be brought initially in a district court (assuming it can be brought). *See Moms Against Mercury v. FDA*, 483 F.3d 824, 827 (D.C. Cir. 2007); *see also Weber v. United States*, 209 F.3d 756, 758–59 (D.C. Cir. 2000). The APA contains no grant of jurisdiction. *See Int'l Union, UMWA*, 358 F.3d at 42. Although

---

[2] Federal Rule of Appellate Procedure 15(a)(2) provides that a petition for review of an agency order "must: . . . (B) name the agency as a respondent . . .; and (C) specify the order or part thereof to be reviewed."

a court may exercise authority under the All Writs Act, 28 U.S.C. § 1651, to issue writs of mandamus necessary to protect its prospective jurisdiction, *see Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 76 (D.C. Cir. 1984) *("TRAC")*, this court's interest in protecting its future jurisdiction "does not arise if the final agency action is not reviewable" in this court, *Moms Against Mercury*, 483 F.3d at 827. MARG points to no statute that would authorize this court to review NIOSH's study upon its completion. *See Weber*, 209 F.3d at 758–59; *see also Bennett v. Spear*, 520 U.S. 154, 178 (1997). Mandamus is an extraordinary remedy unavailable where the right to relief is not clear or where another adequate remedy is available. *See Ass'n Flight Attendants-CWA v. Chao*, 493 F.3d 155, 159 (D.C. Cir. 2007); *Cmty. Nutrition Inst. v. Young*, 773 F.2d 1356, 1361 (D.C. Cir. 1985). In any event, MARG's petition did not indicate it sought mandamus relief from NIOSH and HHS, and MARG has not filed a separate petition for mandamus. *See* FED. R. APP. P. 21(a). MARG invokes no other statute that would allow this court to exercise jurisdiction.

MARG's effort to have this court exercise its ancillary jurisdiction fails. MARG points to no precedent suggesting this court should exercise ancillary jurisdiction as to another agency when it is exercising jurisdiction under the All Writs Act to address MSHA's withdrawal of its intent to issue a proposed rule. These circumstances do not suggest this is an occasion where "substantial considerations of fairness or efficiency demand" the exercise of auxiliary jurisdiction. *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1288 (D.C. Cir. 2007) (quotation marks omitted). Moreover, in *In re Tennant*, 359 F.3d 523, 529 (D.C. Cir. 2004), this court cautioned that it was inappropriate to invoke mandamus "solely on the basis that events *might* lead to a filing before an agency or lower court, which *might* lead to an appeal to this court." *Cf. Am. Iron & Steel Inst. v. EPA*, 115 F.3d 979, 985–86 (D.C. Cir.

1997); *Shell Oil Co. v. FERC*, 47 F.3d 1186, 1194–95 (D.C. Cir. 1995).

Accordingly, we deny the industry petitions, and with regard to MARG's individual challenges, we dismiss NIOSH and HHS as respondents, decline to exercise ancillary jurisdiction, and dismiss for lack of jurisdiction.